**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        v.                        07-CR-186S

**KEVIN L. TODD,**

        **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendant, Kevin L. Todd ("the defendant"), is charged in a multi-count indictment with having violated 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 1) and 18 U.S.C. §§ 922(k) and 924(a)(1)(B) (Count 3). (Docket #1). He filed a motion seeking to suppress the evidence seized from his shared residence at 341 Landon Street, Buffalo, New York on May 18, 2007 by New York State Parole Officers. (Docket #21). The government filed a response in opposition to the defendant's motion to suppress. (Docket #24).

The Court ordered an evidentiary hearing on the matter, and testimony and evidence were received on November 29, 2007 and October 19, 2008[1] and transcripts of those proceedings were filed on December 7, 2007 and November 4, 2008, respectively. The government called two witnesses, New York State Parole Officers Beth Hart and Kelly Funderburk. The defendant presented only one witness - his girlfriend and former co-defendant, Janine Heitzinger. (Docket #s 38 and 84). Post-hearing memoranda were thereafter filed by the parties on December 5, 2008. (Docket #s 92, 93, 97, 98).

## FACTS[2]

On May 18, 2007, New York State Parole Officer Beth Hart and "a few other parole officers were out looking for parolees who had absconded from parole supervision, including one Janine Heitzinger." The officers had received a tip that Ms. Heitzinger "was actually staying at [341 Landon Street, Buffalo, New York]." (T1. 18, 71). The officers had a warrant for the arrest of Ms. Heitzinger. (T1. 20) (Government

---

[1] The proceedings were delayed for a lengthy period of time because the defendant sought to call his girlfriend, Janine L. Heitzinger, as a witness in the evidentiary hearing. However, Ms. Heitzinger was a named co-defendant in this indictment and complex issues relative to her right against self-incrimination needed to be resolved. Ultimately she entered a plea of guilty to a Superseding Information before the Hon. William M. Skretny on August 8, 2008 (Docket #79) thereby resolving the issue of self-incrimination. Ms. Heitzinger testified at the October 10, 2008 proceedings. (Docket #84).

[2] The facts are taken from the transcripts of the proceedings before this Court on November 29, 2007 and October 10, 2008 as well as from the submissions by the parties. References to the evidentiary hearings are designated by T1 (November 29, 2007 hearing) and T2 (October 10, 2008 hearing) followed by the appropriate page number(s).

Exhibit 1). Three Hundred Fourty-One Landon Street consisted of a downstairs and upstairs apartment, and the information received indicated that Ms. Heitzinger was in the downstairs apartment. (T1. 19-21). When no one responded to the officers' knocking on the door of the downstairs apartment, the officers knocked on the adjoining door which led to the upstairs apartment. The defendant responded to this knocking by opening the door to the upstairs flat. (T1. 19-20, 72, 79). Parole Officer Funderburk explained to the defendant that "they were looking for Janine [Heitzinger]" since they "had received a tip that she was staying at the apartment downstairs." Officer Funderburk asked the defendant in what apartment he resided and the defendant replied "the lower." Officer Funderburk asked if there were "any problem with [them] coming [into the apartment] and looking for or searching for Ms. Heitzinger." The defendant responded "no." (T1. 72, 80). The defendant cooperated with the officers and unlocked the door to the downstairs premises. (T1. 22-23, 33, 73, 79-80). Thereupon, the officers commenced a safety search or sweep of the premises as well as a search for Ms. Heitzinger. (T1. 22, 74, 83). Officer Funderburk remained with the defendant the "entire time" while the search was being conducted by the other officers. (T1. 74, 85).

The defendant advised Officer Funderburk "that he and Janine [Heitzinger] had been staying there" and that "they had a fight the prior evening and she had left the residence." (T1. 24, 72).

When Ms. Heitzinger heard the knocking on the door, she went to the basement of the premises and hid under a mattress. (T2. 9-10, 14-15, 24, 25, 28). Prior to that she had been resting on a bed in the first floor bedroom. There was a gun on the bed where she was resting when the parole officers came to the house, and she left it on the bed when she ran to the basement to hide. (T2. 15, 16, 25, 37). She claimed that she had taken the gun from "in between the mattress (sic)" where it had been put by the defendant. (T2. 37). While she was hiding in the basement, she heard the parole officers enter the lower apartment and thereafter she "thought she heard a male officer say 'gun' or 'something about a gun'." (T2. 13, 29, 31, 39). After that, parole officers Hart and Sears conducted a search of the basement and discovered her hiding "underneath a mattress." She was handcuffed and taken upstairs. (T1. 25-26; T2. 13). She claims that when she was upstairs with the parole officers, she did not hear "a parole officer shout out the words, 'I got a gun or gun'." (T2. 13). However, while she was upstairs, she did see "one of the officers carrying the gun" that she said she had left on the bed. (T2. 32, 39-40).

The officers had observed "drug paraphernalia on the table [in the living room] in the form of baggies, residue, things like that, we well as a large amount of female belongings and clothing, giving the impression that Janine [Heitzinger] had been staying there" when they first entered the premises and during the safety sweep. The defendant was asked by Officer Funderburk "if [they] could continue the search" in order "to see what other violations could have occurred with Ms. Heitzinger being there," and the defendant replied, "no problem." The officers never told the defendant

that he did not have to consent to the search or that he could leave the apartment. (T1. 27, 75-76, 83-84, 86). Thereupon, the officers continued their search of the premises. (T1. 77). Officer Hart proceeded to search a bedroom and looked under the bed mattress where she discovered a gun. Upon doing so, she yelled out "gun." (T1. 28, 63, 66, 77). At that point, Officer Funderburk asked the defendant to stand up and placed handcuffs on the defendant for reasons of safety. (T1. 78). The gun was seized as evidence and is the subject of defendant's motion to suppress the evidence.

## DISCUSSION AND ANALYSIS

The main thrust of the defendant's argument in seeking to suppress the use of the gun as evidence at the trial is that "the search [by the parole officers] went beyond the scope of the consent given" by the defendant, namely, "that the scope of the search" for which consent had been given "was to find a person, and not to continue to search for contraband, or parole violators once that person was found." (Docket #92, p. 7). In the alternative, the defendant argues that "there was no second consent to search for contraband and [that] none was sought" (Docket #92, p. 8) which argument is related to his claim attacking the credibility of the parole officers as to "the sequence of events" and when the gun in question was found. (Docket #92, pp. 10-15). Lastly, the defendant argues that the scene at 341 Landon Street, Buffalo, New York on May 18, 2007 was such that there was a "coercive atmosphere [that] precluded voluntary consent" by the defendant. (Docket #92, pp. 9-10).

Each of these arguments will be separately addressed herein.

1. **The Defendant's Credibility Issue:**

In support of his argument that the testimony of Parole Officers Hart and Funderburk are "not credible," the defendant cites what this Court considers to be minor discrepancies between the two as to the amount of time expended in conducting a "safety sweep" or search of the premises and the "chronological" description of the events as set forth in the Supplemental Violation of Release Report prepared by Funderburk. (Defendant's Exhibit C).

The defendant further argues that there are contradictions as to who found the gun and when the gun was discovered. (Docket #92, pp. 13-14).

Finally, the defendant argues that the testimony of his girlfriend, Janine Heitzinger, contradicts the testimony of Parole Officer Hart and therefore, Hart's testimony should not be considered credible. (Docket #92, p. 14).

This Court not only had the opportunity to hear the sworn testimony of Officers Hart and Funderburk and Ms. Heitzinger, but also had the opportunity to closely observe the demeanor of each witness as she or he testified. As a result, it is the finding of this Court that the testimony of Officers Hart and Funderburk is credible and that of Ms. Heitzinger is not.

Ms. Heitzinger testified that before she ran to the basement to hide, she had removed the gun from under the mattress where the defendant had placed it in the

bed on which she was lying in the apartment bedroom and had placed it on the bed because of her dispute with the defendant. When she heard the officers knocking on the door, she claims she left the gun on the bed and ran into the basement and hid. (T2. 15-16, 25, 37). If that were true, the gun would have been visible to the officers when they did the initial "safety sweep" of the apartment and they would have been justified in seizing it not only for safety reasons but also as evidence of possible criminal activity of a parolee since it would have been in "plain sight" if Heitzinger's testimony were accepted.

Secondly, Ms. Heitzinger merely testified that while hiding in the basement, she *thought* she heard a male officer say 'gun'" or "something about a gun." (T2. 13, 29, 31, 39). This testimony was not in the least bit convincing, especially considering she was in the basement under a mattress and not in the immediate vicinity of the bedroom where she allegedly left the gun and where the officers testified the gun was found.

She testified that she was under the "living room" and not the bedroom while hiding under the mattress in the basement and that she "did not know" how far away from a "floor vent of the bedroom" she was. (T2. 12). She also testified that she "did not know if [the officers] were in the bedroom" while she was hiding in the basement. (T2. 13).

If the gun were left on the bed as Heitzinger claimed, it makes no sense for the officers to concoct a story that the gun was found under the mattress after a "second consent to search" was given by the defendant. Once again, accepting Heitzinger's version, the officers could easily have said that the gun was in "plain view" when they did their initial "safety sweep" of the premises and it was seized for "safety" reasons as well as evidence of contraband.

It is also pointed out that Ms. Heitzinger does not deny that it was Officer Beth Hart who found her hiding in the basement underneath the mattress and admitted that it was a "female officer" who found her. (T2. 30). If the gun were found before Heitzinger was found by officer Hart in the basement, why would Officer Hart testify that it was she who found the weapon under the bedroom mattress after Heitzinger had been brought upstairs from the basement? (T1. 28, 63, 66, 77).

It is also undisputed that the defendant remained in the living room with Officer Funderburk while the "safety sweep" and search for Heitzinger were conducted. (T1. 74, 85). The exhibits submitted by the defendant (Defendant's Exhibits E and F) show the living room in very close proximity to the bedroom where the gun was found and also establishes that there was a clear view of the bed in that bedroom from the living room. Notwithstanding that the defendant was in the better position to describe the search of the bedroom and the discovery of the gun and the timing of the discovery, he chose not to do so.

Officer Beth Hart testified that after she brought Heitzinger upstairs from her hiding place in the basement, she participated in the search to determine if there were additional parole violations, and while doing so, she discovered the gun in question underneath the mattress of the bed in the first floor bedroom. (T1. 28, 63, 66, 77).

Ms. Heitzinger also testififed that when she was first brought up from the basement, she did not see the gun in question - "not for a minute" - but that "later" she saw "one of the officers was carrying a gun." (T2. 32). This testimony is consistent with that of Officer Hart, namely, the gun was discovered after Heitzinger had been brought up from the basement.

Therefore, it is hereby RECOMMENDED that defendant's motion to suppress the evidence on the basis of lack of credibility of the officers be in all respects DENIED.

### 2. The Scope Of Defendant's Consent:

The defendant "does not dispute that he gave permission for the officers to look for Ms. Heitzinger." He does dispute that he gave any subsequent, additional permission to look around the apartment for anything else once she was found." (Docket #92, p. 7). To a certain extent, this position of the defendant contradicts his claim that the gun in question was found *before* Ms. Heitzinger was found hiding in the basement underneath a mattress. (*See* discussion above on credibility issue).

Nevertheless, this claim of the defendant will be addressed herein.

The burden of establishing the validity of a consent to search is upon the government. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Florida v. Royer*, 460 U.S. 491, 497 (1983); *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

In meeting its burden of establishing that a consent to search was validly given, the government need only show by a preponderance of the evidence that the consenting party freely and voluntarily gave his consent to search. In this regard, the credibility of the witnesses is a question for the judge who heard them. *United States v. Miley,* 513 F.2d 1191, 1201 (2d Cir.), *cert. denied*, 423 U.S. 842 (1975).

In determining whether a consent to search is valid or not, the "totality of the circumstances must indicate that it was voluntarily given." *United States v. Davis*, 967 F.2d 84, 86 (2d Cir.), *cert. denied by Content v. United States*, 506 U.S. 928 (1992), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973); *United States v. Isofia*, 370 F.3d 226, 231 (2d Cir. 2004); *United States v. London*, 148 Fed. Appx. 19, 22 (2d Cir. 2005). Stated another way, a determination must be made as to whether, under a totality of the circumstances, "the consent was a 'product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (internal citations omitted).

> The standard for measuring the scope of a . . . consent
> under the Fourth Amendment is that of 'objective'
> reasonableness - what would the typical reasonable person
> have understood by the exchange between the officer and
> the [consenting party].

*Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).

Parole Officer Funderburk testified that upon entry into the premises by the defendant, he observed "drug paraphernalia" and "marijuana residue in the ashtray." (T1. 75, 84). This observation "geared [him] to say there were more possible violations there once [Ms. Heitzinger] was found." (T1. 84, 76). Officer Funderburk further testified that once Heitzinger had been found and brought up from the basement, he asked the defendant, "could we continue the search" and that the defendant replied, "no problem" and told him "go ahead." (T1. 75, 84).

At the time that Officer Funderburk asked the defendant if they could continue the search, the defendant was not handcuffed; no weapons were drawn by the parole officers; no voices were raised, and no badgering or physical handling of the defendant by the officers occurred. (T1. 76-77, 85). Admittedly, Officer Funderburk did not advise the defendant that he did not have to consent to a continuation of the search of the premises or that he could leave the apartment if he chose to do so. (T1. 86).

I find the testimony of Officer Funderburk on this issue to be credible. It is further noted that the defendant has not put forth any evidence that contradicts Officer Funderburk's testimony on this issue.

> [W]hether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine quo non* of an effective consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995); *United States v. Drayton*, 536 U.S. 194, 206-207 (2002).

Considering the totality of the circumstances that existed on May 18, 2007 at 341 Landon Street as established by the evidence presented in the evidentiary hearings of November 29, 2007 and October 10, 2008, I find that the defendant did voluntarily consent to a continuation of the search of the premises which resulted in the finding of the gun under the mattress in the bedroom.

I further find that it was objectively reasonable for Officer Funderburk and the other officers to believe that the scope of the defendant's consent permitted them to conduct the subsequent search that was undertaken.

As the United States Supreme Court has ruled:

> The touchstone of the Fourth Amendment is reasonableness . . . . The standard for measuring the scope of [the consenting party's] consent under the Fourth Amendment is that of "objective" reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the [consenting party]? (citations omitted) . . . .
>
> * * *
>
> The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the [consenting party's] consent permitted him to [conduct the search that was undertaken].

*Florida v. Jimeno*, 500 U.S. 248, 250-251, 249 (1991); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).

Therefore, it is RECOMMENDED that defendant's motion to suppress the evidence seized on the basis of no consent to search be in all respects DENIED.

### 3. The Defendant's Claim Of A "Coercive Atmosphere" Thereby Preventing A Voluntary Consent To Search:

The defendant argues that because (1) "Funderburk had already decided that if they found Heitzinger, they would continue to look for possible parole violations;" (2) "there had been six officers inside and outside the apartment" and that "some of them had gone through the house for 15 minutes already while Officer Funderburk stood guard over [the defendant];" (3) "the officers all had guns, and Funderburk's gun was possibly visible;" and (4) because "Funderburk did not tell [the defendant] that he did not have to give permission to continue to search the apartment, or that he could

-13-

leave the apartment if he wanted to;" "the totality of these circumstances lead to the inescapable conclusion that the atmosphere at that point was so coercive, that his will was overborne."  (Docket #92, p. 10).

These arguments are without merit and are rejected.  The fact that the parole officers appeared to be a force based on numbers, or that they had guns or that the weapons may have been visible to the defendant "does not necessarily establish coercion."  *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004); *United States v. Drayton*, 536 U.S. 194, 205 (2002); *United States v. Kon Yu-Leung,* 910 F.2d 33, 41 (2d Cir. 1990); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987).  Nor does the fact that the officers did not tell the defendant that he did not have to consent to a continuation of the search of the premises.  *Schneckloth v. Bustamonte, supra; United States v. Garcia, supra*.  The fact that Officer Funderburk "stood guard" over the defendant while the search continued is of no legal consequence to the validity of the search.  *United States v. Snype, supra*; *United States v. Ansoldi, supra* (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary).  Nothing Officer Funderburk said to the defendant indicated a command to consent to the continuation of the search of the premises.  (*See United States v. Drayton, supra* at 206).

The atmosphere at 341 Landon Street, Buffalo, New York on May 18, 2007 was relatively calm once Heitzinger had been found by the officers and taken into custody.  It was in this calm atmosphere that Officer Funderburk asked the defendant if

they could continue searching the premises.  The defendant has not presented anything to support a claim that he was or felt threatened in any way by the officers or that he objected to the continuation of the search of the premises after being asked by Officer Funderburk.  I find that Officer Funderburk did request further permission from the defendant to continue a search of the premises and the totality of the circumstances, including the exchange between Officer Funderburk and the defendant, establishes that the defendant's additional consent was voluntarily given thereby making the subsequent search and seizure of the gun valid.

Therefore, it is hereby RECOMMENDED that defendant's motion to suppress the evidence based on his claim of a "coercive atmosphere" be DENIED; and it is hereby

**ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

*S/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.
United States Magistrate Judge**

DATED: Buffalo, New York
May 1, 2009